IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 5, 2015

**JAMELL FAULKNER v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 9117      Joseph H. Walker, III, Judge**

**No. W2014-01994-CCA-R3-PC – Filed December 3, 2015**

The Petitioner, Jamell Faulkner, filed a petition for post-conviction relief from his convictions of second degree murder and especially aggravated burglary and the accompanying effective sentence of fifteen years. The Petitioner alleged that his lead counsel and his co-counsel were ineffective and that his guilty pleas were not knowingly and voluntarily entered. The post-conviction court denied the petition, and the Petitioner appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Scott A. Lovelace, Ripley, Tennessee, for the appellant, Jamell Faulkner.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Julie K. Pillow, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In October 2011, the Lauderdale County Grand Jury returned a multi-count indictment, charging the Petitioner and two co-defendants, Sammie Haley and Larico Farmer, with first degree premeditated murder, felony murder, especially aggravated burglary of a habitation, commission of a criminal gang offense, and employment of a firearm during commission of a dangerous felony. On January 22, 2013, the Petitioner

pled guilty to second degree murder as a lesser-included offense of first degree premeditated muder and to especially aggravated burglary. Pursuant to the plea agreement, the Petitioner received concurrent sentences of fifteen and twelve years, respectively. The remaining charges were dismissed.

At the guilty plea hearing, the State recited the following factual basis for the pleas:

> Had the matter gone to trial the State would have presented proof that on May 1, 2009, that Larico Farmer, Jamell Faulkner, and Sammie Haley went to the residence where Mr. Cannon was staying . . . , that they kicked in the door and opened fire, killing Mr. Cannon; that there was a handgun used as well as a shotgun used, and there was evidence of both of those weapons having been used both in the residence as well as on the body of Mr. Cannon.
>
> Proof would have further shown that Mr. Cannon was a material witness on a prior murder[, hereinafter "the Gay Street murder,"] in which Sammie Haley was a charged defendant. There would have been proof that Mr. Haley ordered the hit [on Cannon], being a leader of the Vice Lords at that particular time, that the planning occurred at a Jonathan Jones' house on Orange Street in Ripley in which they discussed the details of Mr. Cannon's murder; that they all went in Larico Farmer's car; that Mr. Farmer was the driver; that Jamell Faulkner got out with a handgun and Sammie Haley got out with a shotgun; that they went to the residence, committed the murder, and came back to the vehicle, and they directed Mr. Farmer how to drive the back roads through Gates back to Ripley; that they further burned the clothes in a field off of Cemetery Road in Henning, and they disposed of the guns somewhere in that area as well.

During the plea hearing, the Petitioner said that he was twenty-five years old and had a high school diploma. The court informed the Petitioner that the State had filed a notice of intent to seek the death penalty on the first degree murder charge. The Petitioner agreed that he had signed the guilty plea agreement after discussing the plea with counsel and said that he understood what he was doing. The court advised the Petitioner of the rights he was waiving by entering guilty pleas. The Petitioner said that he was satisfied with counsel's representation. He agreed that he was pleading guilty

willingly and without being coerced or forced. Finally, he said that he had no questions for the court.

Thereafter, the Petitioner filed a pro se petition for post-conviction relief, which the post-conviction court held was timely filed. Post-conviction counsel was appointed, and an amended petition was filed. In the petitions, the Petitioner alleged that his lead trial counsel and co-counsel were ineffective and that his guilty pleas were not knowingly and voluntarily entered.

At the post-conviction hearing, the Petitioner's lead trial counsel testified that he was appointed to represent the Petitioner. Soon after the Petitioner was charged, the State filed a notice that it was seeking the death penalty against the Petitioner. Therefore, lead counsel associated co-counsel, who had just been certified to try capital cases. Lead counsel and co-counsel sometimes spoke with the Petitioner together, and other times they spoke separately with him. Additionally, an investigator assisted with the case.

Lead counsel stated that at the beginning of the case, the State's proof consisted of the statements of four confidential informants. According to the discovery materials, three of the confidential informants said that the Petitioner was not involved. Lead counsel opined that Jamal Buck, the sole confidential informant who implicated the Petitioner, was "completely dirty" and that his testimony alone would have been insufficient to obtain a conviction.

Lead counsel said that he and co-counsel spoke with the co-defendants' attorneys, and they all decided that the best defense strategy was for the defendants to "stick together," meaning that they would go to trial jointly and that none would plead guilty or agree to testify against the others. However, during the pendency of the case, co-defendant Farmer obtained new counsel and went again the previously established strategy. Lead counsel said that at that point, "we lost the team adhesion that we were going to stick together." Farmer eventually pled guilty and gave a statement incriminating the Petitioner.

Lead counsel said that despite Farmer's incriminating statement, co-counsel believed the Petitioner should proceed to trial. Co-counsel maintained that Farmer could be discredited as a witness. Lead counsel disagreed, believing that the jury would not be concerned with any "small discrepancies" in Farmer's testimony. Additionally, Farmer's testimony would have been corroborated by Jamal Buck's testimony. If the case had gone to trial, the defense would have been that the Petitioner was not present during the crime; lead counsel thought that defense would have caused the jury to discount immediately any lesser-included offenses and either acquit the Petitioner or convict him of the charged offenses. Lead counsel stated that the victim was a witness in another first degree murder case and that the State would have actively pursued the death penalty for

the Petitioner based upon "that attack on the administration of justice." Lead counsel opined that "if you kill a witness, kill a judge, kill a police officer, those are all some very highly prejudicial set of facts when it comes to a jury's moral decision to render the verdict of death." He also noted that the jury would have been "death qualified," which, in his opinion, would have increased the Petitioner's chances of receiving the death penalty. Lead counsel believed "that if we went to trial and the jury returned a verdict of first degree, we were going to be in a second trial for life/death." Lead counsel explained that he was not inclined to accept plea offers in lieu of going to trial; however, in the Petitioner's case, he thought the risk of conviction and a death sentence was too great. Lead counsel thought the State's offer of fifteen years was a good deal.

Lead counsel said that he and co-counsel discussed the discovery materials with the Petitioner. Lead counsel stated that Cannon was a witness in the Gay Street murder and that Cannon's murder was a "hit" accomplished by someone sneaking into Cannon's house and shooting him in the back of the head with a large caliber weapon. Lead counsel stated that the proof did not support a lesser-included offense or the defenses of diminished capacity, intoxication, insanity, or self-defense. Lead counsel explained to the Petitioner the difficulty of defending a death penalty case when his only defense was he was not present, and lead counsel believed that the Petitioner understood the problems.

Lead counsel could not recall whether the Petitioner expressed interest in entering an Alford plea[1] but asserted that the Petitioner's was a "likely case" for such a discussion due to his constant assertions of his innocence. Lead counsel said that he would have told the Petitioner that an Alford plea "was technically meaningless" because the plea still resulted in a conviction.

On cross-examination, lead counsel said that he had represented several clients facing the death penalty, both in Tennessee and Arkansas. He stated that the Petitioner's case was "gang related" and that the State sought the death penalty on that basis. Lead counsel filed motions to preserve a challenge to the constitutionality of imposing the death penalty in a gang related case. Lead counsel thought he filed a motion to sever the defendants' cases but did not recall arguing the motion.

Lead counsel said that after Farmer pled guilty and gave a statement implicating the Petitioner, counsel discussed the matter with the Petitioner. Lead counsel was concerned that the other co-defendant would agree to plead guilty and testify against the Petitioner.

---

[1] An accused who wishes to plead guilty yet assert his innocence may enter what is known as a "best interest" guilty plea. See North Carolina v. Alford, 400 U.S. 25, 37-38 (1970). A trial court may accept such a plea if the court is satisfied that there is a factual basis for the plea. See Dortch v. State, 705 S.W.2d 687, 689 (Tenn. Crim. App. 1985).

Lead counsel estimated that he met with the Petitioner at least ten times during his representation and opined that the number of meetings was "[d]efinitely adequate." With the help of the investigator, the facts of the case were fully investigated, and all of the necessary motions were filed. Lead counsel advised the Petitioner of his rights, the legal issues, and the potential ramifications of a trial versus a guilty plea. The Petitioner understood the ramifications of his guilty pleas, and counsel would not have allowed the Petitioner to plead guilty if he had been "uninformed or confused." Lead counsel answered the Petitioner's questions and explained the terms of the plea agreement. Lead counsel said that the Petitioner was "laid-back," "easy-going," "respectful," and "nice."

Lead counsel denied that he or co-counsel induced or coerced the Petitioner into pleading guilty. Lead counsel thought that he and co-counsel arguing their different views on whether the Petitioner should go to trial or plead guilty was beneficial in that the Petitioner ultimately was well-informed of all the alternatives available to him. Nonetheless, lead counsel advised the Petitioner that the decision to plead guilty or go to trial was the Petitioner's decision.

Co-counsel testified that he began representing the Petitioner in the first week of January 2013. From the beginning, he was aware that the State intended to seek the death penalty. After learning that the charges stemmed from the killing of Cannon, who was a witness to the Gay Street murder, co-counsel concluded that the State would actively pursue the death penalty. Co-counsel noted that in the "discovery packet," which consisted of approximately two hundred pages of materials, the Petitioner's name was mentioned on only two pages.

Co-counsel said that co-defendant Sammie Haley was indicted for the Gay Street murder and for the murder of Cannon. Two confidential informants in the Petitioner's case, Willie Buck and Jamal Buck, also were indicted for the Gay Street murder. Co-counsel said that "everyone" involved in the two murders "knew each other." He recalled that the State had two other confidential informants, Donald Robinson and Antonio Toomes. Robinson, Toomes, and Willie Buck said that Jamal Buck was the person responsible for murdering Cannon. However, after agents of the Tennessee Bureau of Investigation (TBI) told Jamal Buck that "the first person to tell us . . . something[] will get a deal," he implicated the Petitioner. Co-counsel said that Jamal Buck made the statement to save himself and that the statement was untruthful and contained many inconsistencies. For example, Jamal Buck said that at the time of Cannon's murder, Buck was picking purple hull peas; co-counsel said that the earliest purple hull peas could be harvested was May 31 and that the murder was committed on May 1, 2009. Co-counsel also noted that Jamal Buck stated that "at the time that [Cannon's] murder was planned he went by the home of Jonathan Jones and Eric Washington, that he looked in a back window of the living room which happened to be

open and heard people plan the murder, and then the murder was later carried out." Co-counsel said that Jones and Washington were murdered while the Petitioner was in custody and that co-counsel never had the opportunity to speak with them.

Regarding the confidential informants, co-counsel noted that Willie Buck was incarcerated while the Petitioner's case was pending and that Willie Buck's testimony in "penitentiary clothes," could have had "an effect" on the jury. Willie Buck was initially cooperative but eventually became less so. Further, co-counsel said that "there was quite a bit of paper in this county to impeach [Willie Buck] with his conduct." Co-counsel recalled that Robinson and Jamal Buck were charged with committing another murder during the week of Cannon's murder; Robinson pled guilty, but Jamal Buck's charges were dismissed. Co-counsel thought Toomes may have had a history of drug convictions.

Co-counsel testified that he suspected that Jamal Buck murdered Cannon and "was working it off" by acting as a confidential informant for the TBI. Co-counsel found records indicating that during an eight- or nine-month period while Jamal Buck was released from prison, a person assigned a specific confidential informant number was listed "in more than two-thirds of the cases where people were indicted" in Tipton and Lauderdale Counties. Co-counsel acknowledged, however, that the defense was not able to confirm from discovery that Jamal Buck was being compensated in any way for his cooperation.

Co-counsel said that the Petitioner's prior criminal history consisted of misdemeanor convictions of possession of marijuana and possession of a weapon. Co-counsel said that the Petitioner was shy but had "an excellent disposition" and that at the time of the plea, no decision had been made about whether the Petitioner would testify. Nevertheless, counsel and the Petitioner had discussed the Petitioner's right to testify.

Co-counsel said that he "was probably more aggressive than any of the other defense attorneys" representing the defendants in the case. He did not believe that Jamal Buck "could have held up to three cross-examinations based on the number of lies he told." Accordingly, co-counsel wanted the Petitioner to go to trial and discussed the matter with lead counsel, the other defense attorneys, and the Petitioner. Co-counsel asserted, "[W]e had a question of whether it would be right for our client to risk his whole life, when he would be out of prison under the deal presented when he is younger than I am, and that was a very tough decision for him to make."

Co-counsel said that he visted with the Petitioner at least once a month, usually twice a month. Around Thanksgiving, the conversations between co-counsel and the Petitioner focused on whether the Petitioner should proceed to trial or plead guilty. Co-counsel testified that with the potential for appeals and the future cooperation of the

Tennessee Office of the Post-Conviction Defender, "I really never thought a death penalty would stand against [the Petitioner] for 20 years of futher litigation, so I thought we should go to trial."

Co-counsel said that the Petitioner was usually quiet during their discussions. The Petitioner did not believe that Farmer would implicate him; however, Farmer pled guilty and inculpated the Petitioner. The Petitioner then became "very quiet and very deep in thought" and two weeks later decided to plead guilty. Co-counsel said that the Petitioner wanted to enter an Alford plea, but lead counsel told the Petitioner that "he shouldn't really make hay about that, that he was facing a capital sentence and getting 15 years, he ought to just plead guilty and get into the night with it."

On cross-examination, co-counsel stated that he and lead counsel explained that a conviction would result from an Alford plea; nevertheless, the Petitioner wanted to maintain his innocence. Co-counsel acknowledged that his representation began shortly after he was certified to work on a capital case and that the Petitioner's case was the only capital case on which he had worked.

Co-counsel described his and lead counsel's communication with the Petitioner as "good." He said that Petitioner's involvement in a gang was a concern. Co-counsel noted that the Petitioner's stepfather was a well-known gang leader but that the Petitioner had tried to "turn[] his back on it." Co-counsel intended to argue at trial that Jamal Buck committed the offense. Counsel kept the Petitioner well-informed about what they planned to do at trial. Co-counsel said that he "was ready to have [his] Matlock moment" during cross-examination of Jamal Buck. He acknowledged, however, that "most people thought [he] was crazy with [his] purple hull pea theory and how far [he] was ready to take that one."

Co-counsel asserted that he fully investigated the facts and legal issues in the case. He said that the best option for all of the defendants would have been to "stick[] together." Co-counsel did not think that Farmer's guilty plea changed the dynamic of the case but acknowledged that lead counsel and counsel for the other defendants "were really shaken by that and thought that that changed everything." Lead counsel became convinced that the Petitioner should plead guilty. Co-counsel thought they should ask for a severance from co-defendant Haley's case, thinking that Haley's trial could be first. After discussing the matter with lead counsel, they opted not to seek a severance because there was no guarantee that the cases would be severed or that the cases would be tried in a certain order.

Co-counsel maintained that he and lead counsel advised the Petitioner of his rights, of the benefits and disadvantages of a trial versus a guilty plea, and of the consequences of pleading guilty. Co-counsel thought the Petitioner was well-informed

and that he understood what he was doing, noting that the Petitioner was smart and was in college. Co-counsel said that even though he and lead counsel disagreed about the best course of action, they were always "civil." Lead counsel warned co-counsel and the Petitioner that the Petitioner did not have a much of a chance once a capital qualified jury was picked. Co-counsel acknowledged that he had never tried a capital case. Co-counsel noted that he was congratulated by other attorneys for securing a good deal for the Petitioner and for saving the Petitioner's life. He asserted that the Petitioner ultimately made the decision to plead guilty and that he was not coerced into pleading guilty.

The Petitioner testified that he was twenty-seven years old and that he had some undergraduate education. His prior criminal history consisted of two misdemeanor convictions, one for possession of marijuana and one for unlawful possession of a weapon.

The Petitioner acknowledged that he met with counsel at least once a month. At first, lead counsel was prepared to go to trial but then favored a guilty plea. Co-counsel consistently wanted to go to trial. The Petitioner said that he wanted a trial so that the jury could see him as an individual, not as part of a gang. Nevertheless, the Petitioner felt he should follow lead counsel's recommendation and plead guilty in order to avoid the death penalty. The Petitioner feared that if he were convicted at trial, he would be sentenced to death.

The Petitioner said that he wanted his case severed from his co-defendants' cases. He acknowledged counsel filed a motion to sever, but he said it was never pursued. The Petitioner said that counsel informed him of the identities of the confidential informants. The Petitioner knew that three of the informants implicated Jamal Buck, who was the only informant to implicate the Petitioner. After pleading guilty, co-defendant Larico Farmer also implicated the Petitioner. At that point, lead counsel advised the Petitioner to plead guilty.

The Petitioner said that his counsel did not explain the trial process or prepare him for trial, noting that "we never got that far." The Petitioner stated that counsel explained the risks and benefits of a trial and of pleading guilty "[t]o some extent." The Petitioner opined that he gave more weight to lead counsel's opinion; however, he felt that lead counsel "overestimated the evidence against" him.

The Petitioner said that his decision to plead guilty was influenced by lead counsel overestimating the risk of receiving the death penalty at trial. The Petitioner asserted his innocence.

On cross-examination, the Petitioner said that "[i]t was put like if I'm convicted I'm automatically going to get the death penalty. . . ." Nevertheless, he acknowledged that the jury would have been responsible for deciding his punishment.

The Petitioner said that Farmer pled guilty two weeks before the Petitioner. Counsel advised the Petitioner that Farmer and Jamal Buck gave statements implicating the Petitioner. Counsel explained that the jury would determine the witnesses' credibility.

The Petitioner agreed that he decided to plead guilty so he would be assured of the outcome, but he asserted that he had wanted to go to trial. The Petitioner acknowledged that counsel reviewed the plea agreement with him and that he did not ask any questions about the agreement. The Petitioner conceded that during the plea hearing, he told the trial court that he was guilty and that he was satisfied with the representation of counsel.

The Petitioner acknowledged that the State had previously offered a twenty-five year sentence. The Petitioner admitted that he understood he was pleading guilty to second degree murder and especially aggravated burglary and accepting an effective fifteen-year sentence.

The post-conviction court held that counsel were not ineffective. The court found that counsel investigated the Petitioner's case, met with the Petitioner multiple times, and advised the Petitioner about his options. The court found that the Petitioner knowingly and voluntarily chose to plead guilty rather than risk facing the death penalty. Based upon the foregoing, the post-conviction court denied the petition for post-conviction relief. On appeal, the Petitioner challenges this ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, a Petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the Petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). Moreover, in the context of a guilty plea, "the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998); see also Hill v. Lockhart, 474 U.S. 52, 59 (1985).

When a defendant enters a plea of guilty, certain constitutional rights are waived, including the privilege against self-incrimination, the right to confront witnesses, and the right to a trial by jury. Boykin v. Alabama, 395 U.S. 238, 243 (1969). Therefore, in order to comply with constitutional requirements a guilty plea must be a "voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). In order to ensure that a defendant understands the constitutional rights being relinquished, the trial court must advise the defendant of the consequences of a guilty plea and determine whether the defendant understands those consequences. Boykin, 395 U.S. at 244.

In determining whether the Petitioner's guilty pleas were knowing and voluntary, this court looks to the following factors:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). Further, we note that "[a] petitioner's solemn declaration in open court that his plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations 'carry a strong presumption of verity.'" Dale Wayne Wilbanks v. State, No. E2014-00229-CCA-R3-PC, 2015 WL 354773, at *10 (Tenn. Crim. App. at Knoxville, Jan. 28, 2015) (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)).

On appeal, the Petitioner makes general claims that his counsel were ineffective and that his guilty pleas were not knowingly and voluntarily entered; however, the Petitioner makes no specific allegations regarding counsel's deficiencies. The post-conviction court found that counsel met with the Petitioner numerous times, discussed the State's proof, advised the Petitioner of his rights, and gave the Petitioner the option of going to trial or pleading guilty. The post-conviction court also found that the Petitioner was well-informed and understood the ramifications of his plea before deciding to plead guilty to avoid the potential of facing the death penalty. The court stated:

> It is not ineffective assistance of counsel to discuss the options with a client and make an informed decision, which was done in this case. An informed decision was made to accept the State's offer. The sentence was agreed upon. The [Petitioner] admitted his guilt. Sentence was imposed per the plea agreement. The [Petitioner] received a substantial reduction in sentence from the possible sentence he would receive if convicted, to include he is serving a sentence and is not slated for execution.

The court noted that at the guilty plea hearing, the Petitioner said that he was satisfied with the representation of counsel, that he understood what he was doing, and that he wanted to plead guilty. Based upon the foregoing, the post-conviction court ruled that the

Petitioner failed to prove his claims for post-conviction relief. Nothing in the record preponderates against the post-conviction court's findings.

### III.  Conclusion

Finding no error, we affirm the judgment of the post-conviction court.


_____
NORMA MCGEE OGLE, JUDGE